No. 24-6048

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

Valerie Eakins,
*Plaintiff-Appellee,*

v.

Whaleco Inc. d/b/a Temu,
*Defendant-Appellant.*

---

On appeal from an Order Denying Arbitration
U.S. District Court, W.D. Oklahoma No. 5:23-cv-00560-J
The Honorable Bernard M. Jones

---

## APPELLANT'S OPENING BRIEF

---

Benjamin G. Shatz (BShatz@Manatt.com)
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067-3119
(310) 312-4000 ♦ Fax (310) 312-4224

*Attorney for Appellant*
Whaleco Inc. d/b/a Temu

Oral Argument Requested

# TABLE OF CONTENTS

PRIOR OR RELATED APPEALS ............................................................. 9

JURISDICTION ................................................................................... 9

ISSUES PRESENTED & STANDARD OF REVIEW ............................. 9

STATEMENT OF THE CASE ............................................................. 10

    A.    Temu operates an online marketplace and Temu's Terms of Use require arbitration to resolve disputes ......... 10

    B.    Eakins created a Temu account and logged-in to Temu, clicking "Continue" buttons on screens that said "By continuing, you agree to our Terms of Use." ................ 13

    C.    Eakins sues Temu in state court; Temu removes the case to federal court ....................................................... 14

    D.    Temu moves to compel arbitration, but the court denies arbitration .......................................................................... 15

SUMMARY OF ARGUMENT ............................................................... 19

ARGUMENT ...................................................................................... 19

    A.    Temu presented evidence that Eakins had actual notice, and Eakins failed to rebut actual notice, which she could and should easily have done by providing her own declaration ................................................................... 19

        1.    The summary judgment standard applies in determining the existence of a valid arbitration agreement ................................................................... 19

        2.    Eakins failed to meet her evidentiary burden and failed to raise a genuine dispute of material fact as to the existence of an arbitration agreement ......... 23

        3.    If a genuine dispute of material fact exists regarding contract formation, this Court should remand for an evidentiary hearing ................ 31

B.    Temu's screens satisfy the inquiry notice test
for contract formation ...........................................................33

    1.    Temu's screen used placement, color, size,
and other factors to make its Terms of Use
reasonably conspicuous................................................34

        a.    Temu's screen is cleanly designed
to provide adequate notice................................35

        b.    Temu's Terms of Use hyperlink was
reasonably sized, bolded, and easily
visible ...............................................................37

        c.    Temu's Terms of Use hyperlink was
sufficiently adjacent to the relevant
"Continue" buttons............................................39

        d.    Temu's repetition of the notices across
multiple screens made the notices more
conspicuous ......................................................40

    2.    Precedent from many courts supports the
conclusion that Temu's screen provided
reasonably conspicuous notice.....................................41

    3.    The district court focused too narrowly on
specific design elements, underestimated the
reasonable user, and did not consider the
webpage as a whole.......................................................49

CONCLUSION .........................................................................54

Oral Argument Request .........................................................54

10th Circuit Rule 28.2 Attachment – Order On Appeal........................55

Certificate of Compliance for Briefs.......................................66

# TABLE OF AUTHORITIES

## CASES

*Adams v. Am. Guar. & Liab. Ins. Co.*,
233 F.3d 1242 (10th Cir. 2000) ........................................ 30

*Adler v. Wal-Mart Stores*,
144 F.3d 664 (10th Cir. 1998) .......................................... 26

*Aldrich v. Univ. of Phx., Inc.*,
661 F.App'x 384 (6th Cir. 2016) ...................................... 27

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................ 20

*Annett v. Univ. of Kansas*,
371 F.3d 1233 (10th Cir. 2004) ........................................ 21

*Avedon Engineering, Inc. v. Seatex*,
126 F.3d 1279 (10th Cir. 1997) ........................................ 31

*Beattie v. TTEC Healthcare Sols.*,
2019 WL 2189481 (D. Colo. May 21, 2019) ................. 21, 23

*Bellman v. i3Carbon, LLC*,
563 F.Appx. 608 (10th Cir. 2014) ..................... 20, 24, 31-33

*Berkson v. Gogo LLC*,
97 F.Supp.3d 359 (E.D.N.Y. 2015) ................................. 40

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ............................. 38-39, 51-52

*Blake v. JPay, LLC*,
2022 WL 1223634 (D. Kan. Apr. 26, 2022) ...................... 26

*BOSC, Inc. v. Bd. of County Commissioners of County of
Bernalillo*, 853 F.3d 1165 (10th Cir. 2017) ................. 20, 32

*Brown v. AutoNation Chrysler Dodge Jeep Ram Sw.*,
2021 WL 2514524 (D. Colo. June 18, 2021) .................... 22

*Clements v. Alto Tr. Co.*,
2023 WL 5002472 (D.N.M. Aug. 4, 2023) ....................... 26

*Clowdis v. Colorado Hi-Tec Moving & Storage*,
2011 WL 5882191 (D. Colo. Nov. 3, 2011) ...................... 21

*Cooper v. Flesner,*
103 P. 1016 (Okla. 1909) ................................................................. 34

*Cordas v. Uber Technologies,*
228 F.Supp.3d 985 (N.D. Cal. 2017) ............................................ 26-27

*Davis v. USA Nutra Labs,*
303 F.Supp.3d 1183 (D.N.M. 2018) ................................................ 22

*Edmundson v. Klarna, Inc.,*
85 F.4th 695 (2d Cir. 2023) ............................................................ 52

*Fagerstrom v. Amazon.com, Inc.,*
141 F. Supp. 3d 1051 (S.D. Cal. 2015) ........................................... 37

*Feld v. Postmates, Inc.,*
442 F.Supp.3d 825 (S.D.N.Y. 2020) .......................................... 40, 43

*Ferrell v. to AppFolio, Inc.,*
2024 WL 158103 (C.D. Cal. Jan. 11, 2024) ................................. 27-28

*Fontanez v. Whaleco, Inc.,*
No. 53-2023CA-000374 (Fla. Cir. Ct. Aug. 29, 2023) ....... 16, 18, 28, 48

*Gennaro v. Avvo, Inc.,*
2019 WL 13488559 (S.D. Cal. May 6, 2019) .................................... 47

*Ham v. CarMax Auto Superstores,*
2024 WL 2093655 (D.N.M. May 9, 2024) ........................................ 32

*Hancock v. Am. Tel. & Tel. Co.,* 701 F.3d 1248 (10th Cir. 2012)
*abrogated on other grounds by Atl. Marine Constr. v. W.D. Tex.,*
571 U.S. 49 (2013) ....................................... 10, 20, 30-31, 33

*HomeAdvisor, Inc. v. Waddell,*
2020 WL 2988565 (Tex. App. June 4, 2020) .................................... 47

*Howard v. Ferrellgas Partners,*
748 F.3d 975 (10th Cir. 2014) ..................................................... 32-33

*Ivy Bridge v. Nature's Sunshine Products,*
2022 WL 604857 (D. Utah Mar. 1, 2022) ..................................... 24-25

*Johnson v. Whaleco, Inc.*,
No. 5:23-cv-403 (M.D. Fla. 2023) .......................................... 16, 18, 48

*Johnson v. Whaleco, Inc.*,
U.S. Dist. LEXIS 184104 (M.D. Fla. Oct. 13, 2023) .......................... 18

*Keebaugh v. Warner Bros. Entm't*,
100 F.4th 1005 (9th Cir. 2024) ................................................ 34, 49

*L&M Enters. v. BEI Sensors & Systems*,
231 F.3d 1284 (10th Cir. 2000) ...................................................... 21

*La Force v. GoSmith, Inc.*,
2017 WL 9938681 (N.D. Cal. Dec. 12, 2017) ....................................... 27

*Lee v. Ticketmaster, L.L.C.*,
817 F.App'x 393 (9th Cir. 2020) ...................................................... 37

*Levine v. Vitamin Cottage Nat. Food Markets*,
2021 WL 4439800 (D. Colo. Sept. 27, 2021) ....................................... 25

*Link v. Wabash R. Co.*,
370 U.S. 626 (1962) ...................................................................... 29

*Martinez v. Capstone Rest. Grp.*,
2021 WL 1723776 (D. Colo, Mar. 31, 2021) ....................................... 25

*Melnick v. TAMKO Bldg. Prod. LLC*,
2022 WL 4355299 (D. Kan. Sept. 20, 2022) .................................. 20, 29

*Melo v. Zumper, Inc.*,
439 F.Supp.3d 683 (E.D. Va. 2020) ............................................. 40, 46

*Meyer v. Uber Technologies*,
868 F.3d 66 (2d Cir. 2017) ......................................................... 37, 43

*Moyer v. Chegg, Inc.*,
2023 WL 4771181 (N.D. Cal. July 25, 2023) ................................. 45, 47

*Nardo v. HomeAdvisor, Inc.*,
2022 WL 17547940 (D. Colo. July 27, 2022) ..................................... 24

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ............................................................ 28

*Nicosia v. Amazon.com*,
    834 F.3d 220 (2d Cir. 2016) ............................................................... 36

*Nicosia v. Amazon.com, Inc.*,
    2017 WL 10111078 (E.D.N.Y. Aug. 18, 2017) .................................... 29

*Oberstein v. Live Nation Entm't, Inc.*,
    60 F.4th 505 (9th Cir. 2023) ........................................................ 35, 40

*Patrick v. Running Warehouse, LLC*,
    93 F.4th 468 (9th Cir. 2024) ........................................................ 34, 38

*Peter v. DoorDash, Inc.*,
    445 F.Supp.3d 580 (N.D. Cal. 2020) .................................................. 46

*Petrie v. GoSmith, Inc.*,
    360 F.Supp.3d 1159 (D. Colo. 2019) ............................................. 22, 25

*Plazza v. Airbnb, Inc.*,
    289 F.Supp.3d 537 (S.D.N.Y. 2018) ................................................... 46

*Port-a-Pour, Inc. v. Peak Innovations, Inc.*,
    2015 WL 558702 (D. Colo. Feb. 10, 2015) ......................................... 21

*Rainey v. A Place for Rover, Inc.*,
    2022 WL 16942849 (C.D. Cal. July 18, 2022) .................................... 44

*Rangel v. Hallmark Cards, Inc.*,
    2010 WL 781722 (D. Kan. Mar. 4, 2010) ........................................... 30

*Rose v. Mercedes-Benz USA*,
    2023 WL 8544143 (N.D. Ill. Dec. 11, 2023) ....................................... 27

*Route App, Inc. v. Heuberger*,
    2022 WL 2316377 (D. Utah 2022) ..................................................... 50

*Selden v. Airbnb, Inc.*,
    2016 WL 6476934 (D.D.C. Nov. 1, 2016) ...................................... 40, 44

*SRI of New Mexico v. Hartford Fire Ins. Co.*,
    2015 WL 12803774 (D.N.M. June 26, 2015) ...................................... 20

*THI of New Mexico at Vida Encantada v. Archuleta*,
    2013 WL 2387752 (D.N.M. Apr. 30, 2013) ........................................ 31

*Vernon v. Qwest Commc'ns Int'l*,
    925 F.Supp.2d 1185 (D. Colo. 2013) ................................................ 22

*Walker v. BuildDirect.com Techs.*,
    733 F.3d 1001 (10th Cir. 2013) ........................................................ 33

*Walker v. Neutron Holdings, Inc.*,
    2020 WL 703268 (W.D. Tex. Feb. 11, 2020) ..................................... 42

*Waltrip v. Pilot Travel Centers*,
    2022 WL 684327 (D.N.M. Mar. 8, 2022) .................................... 21, 26

*Wiseley v. Amazon.com, Inc.*,
    709 Fed. Appx. 862 (9th Cir. 2017) .................................................. 37

*World of Sleep, Inc. v. La-Z-Boy Chair Co.*,
    756 F.2d 1467 (10th Cir. 1985) ........................................................ 21

**STATUTES & RULES**

9 U.S.C. § 1 *et seq.* ............................................................... 15, 20, 31-33

9 U.S.C. § 16(a)(1)(B) .................................................................... 9

28 U.S.C. §§ 41, 1291, 1294(1) .................................................... 9

28 U.S.C. § 1332(d), 1332(d)(2), (5) ....................................... 9, 15

15 Okla. Stat. §§ 775C.1, 775C.2–775C.4 .............................. 14

Fed. R. App. P. 4(a)(1)(A) ............................................................ 9

Fed. R. Civ. P. 56 ............................................... 19, 20-21, 24, 28-32

D.Colo.LCivR 10.1(d), D.UtahCivR 10-1(a)(3), D.Kan. Rule 5.1(a),
    D.Wyo.R. 10.1(a), E.D.Okla. LCvR 5.2(a), N.D.Okla LGnR2-4(a) ..... 37

# PRIOR OR RELATED APPEALS

None.

# JURISDICTION

The United States District Court for the Western District of Oklahoma had jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)&(5). (App-8-10.)[1] Plaintiff alleges Oklahoma citizenship for herself and alleges that Defendant is a Delaware corporation with corporate headquarters in Massachusetts. (App-15.)

The district court entered its order denying arbitration on March 5, 2024. (App-194.) Orders denying arbitration are appealable. 9 U.S.C. § 16(a)(1)(B). Temu timely appealed under Federal Rule of Appellate Procedure 4(a)(1)(A) on March 18, 2024. (App-240.) This Court has appellate jurisdiction under 28 U.S.C. §§ 41, 1291, 1294(1).

# ISSUES PRESENTED & STANDARD OF REVIEW

1.      Did Eakins have an evidentiary burden to supply evidence to adequately oppose Temu's motion to compel arbitration, and does Eakins' failure to supply any evidence mean that Temu's motion should have been granted?

2.      Does Temu's screenflow supply reasonably conspicuous notice of its Terms of Use, thus satisfying the inquiry notice standard?

---

[1] Cites to the one-volume appendix take the form "App-[page]."

This Court has *de novo* review regarding contractual assent. *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1255 (10th Cir. 2012), *abrogated on other grounds by Atl. Marine Constr. v. W.D. Tex.*, 571 U.S. 49 (2013).

## STATEMENT OF THE CASE

### A. Temu operates an online marketplace and Temu's Terms of Use require arbitration to resolve disputes.

Temu operates a global online retail marketplace where consumers can purchase a variety of products through Temu's website ([www.temu.com](www.temu.com)) or mobile smartphone application ("App"). (App-15, 71, 106-07.) To participate in this marketplace, one must first create an account through Temu's website or App. (App-107.) In doing so, a user using an iPhone is presented with the following screen (App-114):



**TEMU**

**Free shipping**
On all orders

**Free returns**
Within 90 days

Email or phone number

**Continue**

Trouble signing in?

OR

Continue with Google

Continue with Facebook

Continue with Apple

Continue with Twitter

By continuing, you agree to our Terms of Use and Privacy & Cookie Policy.

Users can create an account (1) by entering their email or phone number and pressing a "Continue" button, or (2) by pressing one of the other four white buttons to continue using common online account services. (App-114-15.) At the bottom of the screen, beneath these sign-in buttons is a statement in that reads: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." (App-114 [bold original].) After inputting a phone number, the page appears the same, except the text at the bottom reads: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**. You will receive an SMS [Short Message Service, i.e., a text message] for verification purposes only. Message and data rates may apply." (App-115 [bold original].) The bolded "Terms of Use" text is hyperlinked, which leads to Temu's Terms of Use containing a mandatory individual arbitration provision. (App-109, 133-34.)

At the outset of the Terms of Use, in the second paragraph, is notice of Temu's arbitration agreement in all-capitalized text. (App-118.) The Terms of Use then sets forth the Arbitration Agreement in paragraph 20, titled "DISPUTE RESOLUTION." (App-133-38.) Paragraph 20 also asserts in all caps and bold text that the Terms of Use "includes an agreement to arbitration which requires, with limited exceptions, that all disputes between you and Whaleco be resolved by binding and final arbitration." (App-134, allcaps omitted.) Paragraph 20.1 then asserts, *inter alia*:

"you and Whaleco agree that any dispute, claim,
or disagreement arising out of or relating in any
way to your access to or use of the Service, any
communications you receive, any products sold or
distributed through the Services, or the Terms,
including claims and disputes that arose between
us before the effective date of the Terms (each,
a 'Dispute') will be resolved by binding
arbitration …." (App-134.)

## B. Eakins created a Temu account and logged-in to Temu, clicking "Continue" buttons on screens that said "By continuing, you agree to our Terms of Use."

Temu's business records show that on January 19, 2023, Eakins downloaded Temu's App to her Android smartphone and completed all steps to create an account. (App-108, 144.) Specifically, Eakins entered her phone number and clicked the "Continue" button on successive screens that read "By continuing, you agree to our **Terms of Use** …."— i.e., she was presented with the notice text twice. (App-114-15.) On that same date, Eakins subscribed to receive marketing text messages from Temu. (App-111, 146.)

Eakins later logged in to her Temu account at least three times: via the website using her smartphone on February 26, 2023 and via Temu's App on June 7, and July 15, 2023—the latter occurring after Plaintiff filed the underlying lawsuit and just days before Temu moved to compel arbitration. (App-110-11, 144.) Thus, Temu's records show

that Eakins clicked the "Continue" button at least four times on a screen that said "By continuing, you agree to our **Terms of Use** …." (App-114-15 [registration screens], 140-41 [log-in screens].)

Eakins alleges that Temu sent her at least one unsolicited automated text message. (App-17-19, 21.)

## C. Eakins sues Temu in state court; Temu removes the case to federal court.

Eakins sued Temu in Oklahoma state court, filing a proposed class action under Oklahoma's Telephone Solicitation Act (OTSA), 15 Okla. Stat. § 775C.1 *et seq.*, seeking statutory damages and injunctive relief. (App-14-26.) OTSA prohibits telephonic sales calls, including text messages, to wireless phones if such calls involve an automated system for the selection or dialing of telephone numbers without the prior express consent of the receiving party. *See* 15 Okla. Stat. §§ 775C.2–775C.4. Eakins alleged that Temu violated OTSA by sending automated text messages to her cellular phone without her prior express consent. (App-14-19.) Eakins sought to represent a class of several thousand Oklahomans who allegedly received unsolicited text messages from Temu. (App-19-20.)

Temu disputes all of Eakins' allegations, believes her lawsuit is meritless, and denies that Eakins or her putative class have been harmed or that class treatment is appropriate. (App-8.)

Temu removed Eakins' lawsuit to federal court based on federal jurisdiction provided by the Class Action Fairness Act, 28 U.S.C. § 1332(d). (App-8-10.)

### D. Temu moves to compel arbitration, but the court denies arbitration.

On July 25, 2023, Temu moved to compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* (App-61-96.) Temu explained that Eakins had downloaded Temu's App onto her smartphone, created a Temu account, and had logged into the App several times thereafter. (App-71, 108, 111, 144.) Moreover, Eakins also signed up to receive marketing texts from Temu. (App-111, 146.)

Eakins input her personal information and clicked the "Continue" button to create her account on a screen that had the bolded hyperlinked "**Terms of Use**" in close proximity to the button, along with adjacent text explaining that "By continuing, you agree to our **Terms of Use.**" (App-72, 81). By so doing, Eakins manifested her assent to those terms. In fact, Eakins saw the language about agreeing to Temu's **Terms of Use** twice during her account creation, and then at least three more times when she later logged into Temu. (App-76-77.) Temu explained that its burden was only to prove the existence of a contract by a preponderance of the evidence, which would then shift the burden to Eakins to disprove contract formation. (App-82.) Furthermore, Temu cited cases to establish that the average reasonable

adult consumer understands by signing up online for services, he or she is accepting the terms and conditions of the provider. (App-82.)

To remove any doubt about the effectiveness of Temu's enrollment process and screens, Temu cited a case in which a plaintiff/user was found to have assented to Temu's Terms of Use in essentially the same way that Eakins did: *Fontanez v. Whaleco, Inc.*, No. 53-2023CA-000374 (Fla. Cir. Ct. Aug. 29, 2023). (App-85, 99-103 [*Fontanez* decision].)

Temu noted how its screen presented its Terms of Use in a common manner similar to that used by many other companies, and approved in many other cases. Specifically, Temu's assent-text was clear, legible, bolded, and proximate to the action button that a user had to click to proceed. (App-87.) Therefore, Temu maintained that Eakins had actual notice of the Terms of Use, or least had inquiry notice of the Terms, and thus was required to arbitrate her underlying claims. (App-88.)

In opposition, Eakins argued—albeit only through her counsel and with no supporting admissible evidence—that no arbitration agreement existed given the inconspicuousness of Temu's Terms of Use on the screen, i.e., it was "small, lightly colored," and "well beneath the massive, bright orange 'Continue' button …." (App-152, 161.) Eakins cited *Johnson v. Whaleco, Inc.*, No. 5:23-cv-403 (M.D. Fla. 2023) (App-176-80), which analyzed Temu's registration screen, as precedent that

Temu's screen failed to conspicuously notify users that they were agreeing to be bound by Temu's Terms of Use. (App-152, 161.)

Tellingly, Eakins' opposition supplied no evidence whatsoever. In particular, Eakins failed to supply a declaration from her, which could have asserted that she did not know that she was agreeing to Temu's Terms of Use or that she did not see the Terms of Use hyperlink.

Accordingly, Temu's reply began by asserting that its motion to compel arbitration should be granted because Eakins failed to meet her evidentiary burden in opposing Temu's motion. (App-182-85.) Temu supplied evidence that Eakins had actual knowledge of the Terms of Use and assented to them, and Eakins failed to contradict this, e.g., she never denied clicking the "Continue" button nor denied knowing that by doing so she was agreeing to the Terms of Use. Instead, Eakins' opposition focused solely on the inquiry notice test (i.e., that the Terms of Use hyperlink was inconspicuous). Temu then explained why Eakins was also on inquiry notice of the Terms of Use (App-185-88) and distinguished the cases Eakins cited (App-188-91).

The district court denied Temu's motion, without an evidentiary hearing. (App-194-203, __ F. Supp. 3d __, 2024 WL 1190766.) The court concluded that Temu's screens failed to provide reasonably conspicuous notice of its Terms of Use based on a "failure to adequately distinguish the hyperlinked text, coupled with its obscure placement of the terms of

use." (App-201.) Recognizing that evaluating inquiry notice requires courts to engage in "fact-intensive inquiries" about the "design and content" of screens, the court focused on the color and size of the notice text and its position at the bottom of the screen and distance from the orange "Continue" button that Eakins pressed. (App-199-200.)

The district court acknowledged *Fontanez v. Whaleco*, which found that Temu's webpage was conspicuous enough to put the reasonably prudent person on notice. (App-201-02.) But the court found *Fontanez* distinguishable because the plaintiff there used the "Continue with Apple" button and was a plaintiff in other similar class action lawsuits. (App-201-02.) The court also cited *Johnson v. Whaleco*, which found that Temu's Terms of Use were not conspicuous based on its placement at the bottom of the page and the use of a "very light grey font against a white background, devoid of underlined text or any conspicuous visual cues." (App-202, quoting *Johnson v. Whaleco, Inc.*, No. 5:23-cv-403-GAP-PRL, U.S. Dist. LEXIS 184104 (M.D. Fla. Oct. 13, 2023).) The court also discounted the fact of Eakins' subsequent accessing of Temu's screens, where she would have been presented with the Terms of Use notice text again. (App-202.)

Temu timely appealed. (App-204.)

## SUMMARY OF ARGUMENT

Temu's motion presented admissible evidence that Eakins had actual notice of the Terms of Use, yet Eakins failed to rebut actual notice. Eakins' failure to supply a declaration disclaiming assent to Temu's Terms of Use should have sufficed to require the district court to grant Temu's motion.

Apart from actual notice and Eakins' evidentiary failure, the motion should have been granted based on the inquiry notice test. Inquiry notice was satisfied here because Temu's screens provided reasonably conspicuous notice text and readily visible and bolded hyperlinked **Terms of Use**. A fact-intensive examination of the layout and language of Temu's screens establishes that a reasonable user would have seen the notice text and **Terms of Use**.

## ARGUMENT

**A.  Temu presented evidence that Eakins had actual notice, and Eakins failed to rebut actual notice, which she could and should easily have done by providing her own declaration.**

### 1.  The summary judgment standard applies in determining the existence of a valid arbitration agreement.

In resolving contract formation challenges in opposition to motions to compel arbitration, federal courts in this Circuit must apply the familiar Federal Rule of Civil Procedure rule 56 summary judgment standard to determine whether an arbitration agreement exists. *See,*

*e.g., Hancock,* 701 F.3d at 1261. Thus, where a party raises an arbitration agreement formation challenge, "a court may grant a motion to compel arbitration [under the FAA] if there are no genuine issues of material fact regarding the parties' agreement." *Id.* (citations omitted).

This means that the party seeking to compel arbitration "bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable arbitration agreement." *Bellman v. i3Carbon, LLC*, 563 F.Appx. 608, 612 (10th Cir. 2014); *see also BOSC, Inc. v. Bd. of County Commissioners of County of Bernalillo,* 853 F.3d 1165, 1176-77 (10th Cir. 2017) (citing *Hancock*, 701 F.3d at 1261). But to do so, a movant need only show the existence of an agreement to arbitrate by a preponderance of the evidence. *See, e.g., Melnick v. TAMKO Bldg. Prod. LLC*, 2022 WL 4355299, *4 (D. Kan. Sept. 20, 2022); *SRI of New Mexico v. Hartford Fire Ins. Co.*, 2015 WL 12803774, *3 (D.N.M. June 26, 2015).

Once that initial burden is met, the burden shifts to the plaintiff "to raise a genuine dispute of material fact regarding the existence of an [arbitration] agreement." *Bellman*, 563 F.App'x. at 612. Under Rule 56, a fact is "material" if it pertains to an element of a claim or defense, whereas a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Yet, one cannot raise such a dispute in a vacuum under Rule 56, either in the context of a summary judgment motion or a motion to compel arbitration. Rather, a party making an arbitration contract formation challenge can only prevail by submitting admissible evidence establishing a genuine dispute of material fact on that issue. *See, e.g., Waltrip v. Pilot Travel Centers*, 2022 WL 684327, *2 (D.N.M. Mar. 8, 2022) ("Like in the summary judgment context, a party must offer admissible evidence to prove the existence of an [arbitration] agreement.") (citing *Clowdis v. Colorado Hi-Tec Moving & Storage*, 2011 WL 5882191, *8 (D. Colo. Nov. 3, 2011)); *World of Sleep, Inc. v. La-Z-Boy Chair Co.,* 756 F.2d 1467, 1474 (10th Cir. 1985) (only admissible evidence may be considered under Rule 56).

It is also well-established that "'[u]nsupported conclusory allegations ... do not create a genuine issue of fact'" under Rule 56. *Annett v. Univ. of Kansas,* 371 F.3d 1233, 1237 (10th Cir. 2004) (quoting *L&M Enters. v. BEI Sensors & Systems*, 231 F.3d 1284, 1287 (10th Cir. 2000)); *see also Port-a-Pour, Inc. v. Peak Innovations, Inc.*, 2015 WL 558702, *1 (D. Colo. Feb. 10, 2015) ("conclusory allegations that are unsupported by evidence do not create a genuine issue of fact"). As applied in the arbitration context, general denials are not enough to raise a genuine issue of material fact as to the existence of arbitration agreement. *See, e.g., Beattie v. TTEC Healthcare Sols.,* 2019 WL 2189481, *2 (D. Colo. May 21, 2019) ("[g]eneral denials and statements

that a user does not recall visiting a website or agreeing to arbitrate are insufficient to defeat arbitration") (quoting *Petrie v. GoSmith, Inc.,* 360 F.Supp.3d 1159, 1162 (D. Colo. 2019)); *Davis v. USA Nutra Labs,* 303 F.Supp.3d 1183, 1192 (D.N.M. 2018) ("In the face of Groupon's evidence that Plaintiff could not have completed her purchase without clicking on the button accepting Groupon's Terms of Use, the fact that Plaintiff does not remember seeing, or agreeing to, Groupon's Terms of Use is insufficient to create a genuine dispute of material fact.").

Nor are speculative arguments in an opposition brief to a motion to compel sufficient to avoid arbitration. *See, e.g., Brown v. AutoNation Chrysler Dodge Jeep Ram Sw.*, 2021 WL 2514524, *3 (D. Colo. June 18, 2021) ("conclusory legal arguments" are "insufficient to create a genuine dispute of material fact").

Here, Temu presented evidence to support its motion, but Eakins' opposition presented no evidence. Eakins could simply have submitted a declaration denying the existence of an arbitration agreement. But she failed to supply such a declaration, instead relying solely on argument to that effect raised by her counsel in her opposition. The district court should have recognized Eakins' evidentiary failure and as a result should have granted Temu's motion. *See Vernon v. Qwest Commc'ns Int'l*, 925 F.Supp.2d 1185, 1191 (D. Colo. 2013) ("We live in an electronic age. It is commonplace these days to enter into agreements electronically.").

### 2.   Eakins failed to meet her evidentiary burden and failed to raise a genuine dispute of material fact as to the existence of an arbitration agreement.

The district court ruled—without any reference to the evidence submitted by Temu or the lack of evidence from Eakins—that "[t]here is nothing to suggest that [Eakins] had actual notice of [Temu's] terms of use" containing the subject arbitration provision. (App-198.) In so ruling, however, the district court did not properly apply (or even consider) whether Eakins had satisfied her burden to present admissible evidence to raise a genuine dispute of material fact on the contract formation issue. That failure alone constitutes reversible error.

Recent decisions from district courts in this Circuit compelling arbitration on facts highly similar to those here are instructive. In *Beattie*, for example, the defendants "provided an unsigned copy of the arbitration agreement" and "the dates on which [plaintiffs] 'completed' the arbitration agreement" by "clicking [an] 'Accept' button after having an opportunity to read it." *Beattie*, 2019 WL 2189481, *1-2. In response to defendant's motion to compel arbitration, the plaintiffs there (like Eakins here) did not argue that they did not have actual notice of the applicable terms containing the subject arbitration agreement, nor did they submit any evidence in connection with their opposition brief showing that the terms were never provided to them or that they did not have an opportunity to read them. Instead, they argued only that they "do not recall agreeing" to them. *Id*. at *1.

Consequently, the court granted defendants' motion, holding: "In the face of Defendants' records indicating that [p]laintiffs … assented to the arbitration agreement, [p]laintiffs offer only speculative arguments and their lack of recall. This is not enough to raise a genuine dispute about the existence of the arbitration agreement." *Id.* at *2. *See also Nardo v. HomeAdvisor, Inc.*, 2022 WL 17547940, *5-6 (D. Colo. July 27, 2022), *report & rec. adopted*, 2022 WL 17547938 (Aug. 11, 2022) (enforcing agreement where plaintiff did not submit evidence disputing notice and thus did not meet "his burden of raising a genuine issue of material fact in response to the evidence presented" by the defendant) (applying *Bellman*).

Similarly, in *Ivy Bridge v. Nature's Sunshine Products,* 2022 WL 604857, *4 (D. Utah Mar. 1, 2022), the plaintiffs argued the defendant did not meet its initial burden under Rule 56 by failing to proffer evidence of a valid and enforceable agreement to arbitrate that was (1) sent to and received by plaintiffs (2) signed or acknowledged by each plaintiff and (3) that conspicuously informed each plaintiff of the arbitration agreement and plaintiffs' waiver of their right to a jury trial. In compelling arbitration, the court noted that (1) the defendant had submitted a sworn declaration testifying the subject arbitration agreement was emailed to each of the plaintiffs and, thus, the plaintiffs were "sufficiently notified" of the agreement, and (2) the plaintiffs did not submit a sworn declaration of their own denying receiving that

email or any evidence otherwise rebutting the defendant's declaration demonstrating that each of the plaintiffs assented to the agreement. *Id.* Consequently, the court held the "[p]laintiffs' failure to submit any evidence to rebut the [defendant's declaration] precludes the court from finding that there was no agreement to arbitrate" formed. *Id.* at *7.

Numerous other district courts in this Circuit have reached similar conclusions, and have consistently granted motions to compel arbitration like Temu's where the non-movant fails to raise a genuine dispute of material fact on the contract formation issue through competent admissible evidence. *See e.g., Petrie,* 360 F.Supp.3d at 1162-63 (compelling arbitration where plaintiff failed to present "any evidence that would refute the conclusion" that he electronically accepted the defendant's terms); *Levine v. Vitamin Cottage Nat. Food Markets,* 2021 WL 4439800, *7 (D. Colo. Sept. 27, 2021) ("Where the Court has no evidence to suggest that any of these individuals contest the authenticity of the [arbitration] agreements, no issue of material fact is apparent."); *Martinez v. Capstone Rest. Grp.,* 2021 WL 1723776, *3 (D. Colo, Mar. 31, 2021) (compelling arbitration where the defendant met its initial evidentiary burden of demonstrating the existence of an enforceable arbitration agreement, which the plaintiff failed to overcome with any contrary evidence); *Waltrip*, 2022 WL 684327, *6 (plaintiff who failed to submit a sworn declaration to oppose a motion to compel arbitration "has not shown a genuine question of material fact

precluding an order to arbitrate his dispute"; and rejecting the other plaintiffs' self-serving declarations challenging contract formation, which merely stated they did not "recall" seeing the agreement but lacked any competent evidentiary support); *Blake v. JPay, LLC,* 2022 WL 1223634, *5 (D. Kan. Apr. 26, 2022) (plaintiff's "'[v]ague, conclusory statements' that he does not recall the [arbitration] [a]greement 'do not suffice to create a genuine issue of material fact'") (quoting *Adler v. Wal-Mart Stores*, 144 F.3d 664, 674 (10th Cir. 1998)); *Clements v. Alto Tr. Co.*, 2023 WL 5002472, *7 (D.N.M. Aug. 4, 2023) (enforcing arbitration where plaintiff presented no evidence suggesting he "was unable to see or click on the hyperlinks" to the operative terms).

These decisions are in accord with many others from courts around the country. In *Cordas v. Uber Technologies,* 228 F.Supp.3d 985, 989 (N.D. Cal. 2017), for example, the court relied on the declaration of an Uber engineer that described the rider sign-up and registration process and on screenshots of the Uber app in determining whether the plaintiff had agreed to Uber's terms and conditions. Rejecting the plaintiff's contract formation challenge, the court noted that the plaintiff "offer[ed] no evidence to rebut [the Uber engineer's] reasoned declaration other than his own conclusory allegations that he never received notice of the terms and conditions and that [the Uber engineer's] declaration is false and inadequate." *Id.* at 990. Thus, the court held the plaintiff failed to raise a genuine dispute of material fact

on the formation issue. *Id*.; *see also, e.g.*, *Aldrich v. Univ. of Phx., Inc.*, 661 F.App'x 384, 390-91 (6th Cir. 2016) (finding there was "no dispute before the district court that the plaintiffs received" the defendant's handbook containing the subject arbitration agreement and "had notice of the arbitration agreement," despite the fact that plaintiffs generally denied having received, seen, or electronically signed the acknowledgment form, where the plaintiffs "cited no evidence (other than their own affidavits) disputing the university's evidence, and there was therefore no dispute of material fact entitling plaintiffs to a jury trial on the issue"); *La Force v. GoSmith, Inc.*, 2017 WL 9938681, *4 (N.D. Cal. Dec. 12, 2017) (compelling arbitration where plaintiff "himself offer[ed] no declaration regarding his registration on the [defendant's] website"); *Rose v. Mercedes-Benz USA*, 2023 WL 8544143, *3 (N.D. Ill. Dec. 11, 2023) (compelling arbitration where defendant submitted evidence that the arbitration agreement was provided to the plaintiffs, who in turn did "not provide[] factual support that they did not receive actual notice … besides a lack of recollection (and not a sworn denial that it did not occur)"); *Ferrell v. to AppFolio, Inc.*, 2024 WL 158103, *2 (C.D. Cal. Jan. 11, 2024) (compelling arbitration, noting "'courts have consistently enforced [click]wrap agreements where the user had *actual notice* of the agreement,' as where the user must 'manifest assent to the [website's] terms and conditions expressly'—by, for example, clicking a button acknowledging that assent") (quoting

*Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1176 (9th Cir. 2014) (emphasis original)).[2]

*Fontanez v. Whaleco* applied the same summary judgment standard as under Federal Rule of Civil Procedure 56, and compelled arbitration under these same Terms. There, Temu moved to compel arbitration in a case involving essentially the same sign-in processes Eakins used here. (*See* App-99-103.) In granting Temu's motion to compel, the *Fontanez* court noted the plaintiff there likewise "never specifically argue[d] that she did not have actual knowledge of [Temu's] Terms of Use." (App-102-103.) Thus, after considering the layout of Temu's page, the court found that, "by clicking 'Continue,' [that plaintiff] assented to the Terms of Use that contained an arbitration clause." (App-103.)

This precedent demonstrates that the district court erred by not considering Eakin's failure to meet her evidentiary burden when ruling on Temu's motion. Here, Temu submitted admissible evidence supporting its motion, i.e., authenticated business records, demonstrating that its Terms containing the subject arbitration

---

[2] In *Ferrell*, the court compelled arbitration even where the plaintiff admitted in a sworn declaration that she entered into the defendant's clickwrap agreement, but just generally averred that she was "not aware" that she had agreed to arbitrate her claim by doing so, and "did not see an arbitration agreement, or any mention of an arbitration agreement, when [she] signed up." *See* No. 8:23-cv-01353-JWH-DFH (C.D. Cal.), Dkt. 39-1, ¶¶7, 9, 10. Eakins did not even do that much.

provisions were provided to Eakins on multiple occasions—including at least once *after* she filed her lawsuit against Temu (i.e., on July 15, 2023), a mere ten days before Temu filed its motion. (*See* App-144.) *See also Nicosia v. Amazon.com, Inc.*, 2017 WL 10111078, *10-11 (E.D.N.Y. Aug. 18, 2017), *report & rec. adopted,* 384 F.Supp.3d 254 (E.D.N.Y. 2019), *aff'd*, 815 F.App'x 612 (2d Cir. 2020) (compelling arbitration, holding the plaintiff had actual notice of the defendant's terms, where he placed orders on the defendant's website after the litigation began and his attorneys had been notified of the existence of the arbitration agreement) (citing *Link v. Wabash R. Co.,* 370 U.S. 626, 634 (1962)).

In accord with applicable authority cited below and here, this satisfied Temu's initial burden under Rule 56 to show the existence of an arbitration agreement, and is sufficient to demonstrate that Eakins had actual notice of the Terms and Arbitration Provisions and, thus, that a valid arbitration agreement was formed.

In stark contrast, Eakins did not attempt to rebut any of Temu's evidence with any evidence of her own in support of her opposition to the motion (*see* App-147-175)—much less admissible evidence, as required under Rule 56. *See also Melnick*, 2022 WL 4355299, *4, 6 (non-movants have the burden to identify specific evidence demonstrating a material disputed issue as to the existence of an arbitration agreement, and that to demonstrate a genuine issue of material fact, the disputed facts must be identified by reference to an affidavit, a deposition

transcript, or a specific exhibit) (citing *Rangel v. Hallmark Cards, Inc.*, 2010 WL 781722, *4 (D. Kan. Mar. 4, 2010) and *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000)).

Eakins relied instead solely on the mere arguments of her counsel in her opposition brief. (*See* App-147-175.) But that is insufficient to raise a genuine dispute of material fact as to the formation of an arbitration agreement under binding Tenth Circuit precedent. *See Hancock* 701 F.3d at 1265-67 (affirming order compelling arbitration where plaintiff did not provide sworn testimony or any other evidence disputing the existence of an arbitration agreement).

Temu pointed out Eakins' failure to carry her evidentiary burden in its reply briefing on the motion (*see* App-183-185), but the district court ignored this point. Nevertheless, because Eakins failed to meet her evidentiary burden under Rule 56 and did not present a genuine dispute of material fact as to the existence of a valid arbitration agreement with admissible evidence, as required, the district court erred in denying Temu's motion. This Court should therefore reverse.

### 3. If a genuine dispute of material fact exists regarding contract formation, this Court should remand for an evidentiary hearing.

The district court also erred in denying Temu's motion without first conducting an evidentiary hearing, as is also required. As explained above, courts must apply the Rule 56 summary judgment standard when determining the existence of an arbitration agreement. *See Hancock* and *Bellman*, *supra.* Further, Section 4 of the FAA expressly provides that "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

This well-established law dictates that, if there is no genuine issue of material fact concerning the existence of a valid arbitration agreement, a federal court may conclude as a matter of law that the parties entered into such an agreement, and enforce it without a hearing. *See, e.g., THI of New Mexico at Vida Encantada v. Archuleta*, 2013 WL 2387752, *6 (D.N.M. Apr. 30, 2013) ("A court should only decide as a matter of law whether the parties entered into an agreement to arbitrate when there is no genuine issue of material fact concerning the formation of the agreement.") (citing *Avedon Engineering, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir. 1997)).

If, however, the non-movant raises a genuine dispute of material fact on the arbitration contract formation issue, FAA Section 4 *requires* the court to "proceed summarily to trial"—i.e., conduct an evidentiary

hearing—to resolve that issue *before* ruling on the motion to compel arbitration. *See Bellman*, 563 F.App'x at 612; *Howard v. Ferrellgas Partners,* 748 F.3d 975, 984 (10th Cir. 2014) ("Summary-judgment-like motions practice may be a permissible and expedient way to resolve arbitrability questions when it's clear no material disputes of fact exist and only legal questions remain. But when factual disputes may determine whether the parties agreed to arbitrate, the way to resolve them isn't by round after round of discovery and motions practice. It is by proceeding summarily to trial. *That is the procedure [Section 4 of] the [FAA] requires*") (emphasis added); *Ham v. CarMax Auto Superstores,* 2024 WL 2093655, *4 (D.N.M. May 9, 2024) ("When material issues of fact exist, a trial on the existence of the agreement is warranted (by jury, if requested by a party).") (citing *BOSC*, 853 F.3d at 1177).

Here, Eakins failed to meet her Rule 56 evidentiary burden and thus did not raise a genuine issue of material fact on the contract formation issue. While the district court did not opine on whether Eakins had raised a genuine dispute of material fact, the district court compounded that error by simply denying Temu's motion on its face by not following Section 4 of the FAA and conducting the requisite evidentiary hearing.

Put differently, if the district court concluded (or if this Court concludes) that Eakins raised a genuine issue of material fact on the

contract formation issue, that does not mean that she can simply carry on with prosecuting her underlying claim against Temu in court. Rather, FAA Section 4 mandates that there be an evidentiary hearing to resolve those disputed facts and determine whether this case should be arbitrated. The district court's failure to conduct a hearing here constitutes reversible error. *See, e.g., Howard,* 748 F.3d at 984 (reversing and remanding for further proceedings where the district court denied the motion to compel without conducting a trial).

Thus, while this Court should not conclude that Eakins raised a genuine dispute of material fact on the contract formation issue—given her failure to provide any supporting evidence to oppose the motion in the lower court—it should at the very least order the district court to conduct an evidentiary hearing to resolve this dispute.

## B. Temu's screens satisfy the inquiry notice test for contract formation.

The district court also erred by not ruling Eakins was on inquiry notice of Temu's Terms of Use.

This Court recognizes that, under Oklahoma law, if an agreement provides "reasonable notice of its terms" and the "consumer affirmatively manifests assent to the terms," the consumer is bound by the terms. *Hancock*, 701 F.3d at 1256; *see also Bellman,* 563 F. App'x at 612 (quoting *Walker v. BuildDirect.com Techs.*, 733 F.3d 1001, 1004 (10th Cir. 2013) (courts apply "ordinary state-law principles that govern

the formation of contracts to determine whether a party has agreed to arbitrate a dispute"). Courts often call this the "inquiry notice" test and find online consumers to be bound to Terms of Use if a screen provides reasonably conspicuous notice of the terms and the consumer takes some action that manifests assent to those terms. *E.g.*, *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 477 (9th Cir. 2024) (notice was conspicuous where it was "on an uncluttered page and is not hidden or obscured" and "clear and legible"); *Keebaugh v. Warner Bros. Entm't*, 100 F.4th 1005, 1020 (9th Cir. 2024). *See generally Cooper v. Flesner*, 103 P. 1016, 1020-21 (Okla. 1909) ("notice" is knowledge of facts and circumstances that would alert a reasonable, prudent person to investigate).

Here, exercising its *de novo* review, this Court should find that Temu's screen provides reasonable notice of its Terms of Use such that Eakins manifested assent to those terms by creating her account (i.e., clicking the "Continue" button above the notice text reading "By continuing, you agree to our Terms of Use …").

> **1.  Temu's screen used placement, color, size, and other factors to make its Terms of Use reasonably conspicuous.**

When assessing inquiry notice, courts engage in a fact-intensive analysis of the design and content of the screens. Specifically, to evaluate whether an online textual notice is sufficiently conspicuous,

courts examine the totality of the visual elements of the screen, considering factors such as text placement, especially its proximity to any button the user must click to continue; the obviousness of any hyperlinks; text color, particularly compared to the background color; text size; and whether any other elements on the screen clutter or obscure the textual notice. *Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) (size, format, placement, and general website design).

A fair examination of Temu's screen here compels the conclusion that it provided reasonably conspicuous notice.

> ### a. Temu's screen is cleanly designed to provide adequate notice.

The overall design of Temu's screen is clean and uncluttered. The background color is white, making text stand out. There is very little in terms of color—apart from Temu's name, in orange, and one "Continue" button, also in orange. There is nothing on the screen to distract a user from seeing all the text on the page, which is all visible on a single screen, without the need for scrolling to see anything. There are no colorful graphics or distracting moving images. The screen merely contains Temu's name at the top, has two icons and text indicating Temu's benefits (i.e., free shipping and free returns within 90 days), a single box for a user to input either an email or phone number, and then various well-labeled "continue" buttons, one of which must be

clicked to continue. Beneath these buttons is a simple, declarative sentence asserting: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." This notice is not buried in other text nor concealed in any way. Indeed, there are only 46 words on the entire first screen, including this 14-word notice. (App-114.)

The notice text is in ordinary sans-serif font (as is all text on the page) and is easy to see and read. There are no other surrounding or distracting text or images or graphics on the screen. Each screen is designed to be user-friendly, with ample use of white space for easy reading. No other design elements on the screen clutter or obscure the textual notice. This case is unlike *Nicosia v. Amazon.com*, 834 F.3d 220, 237 (2d Cir. 2016), where the webpage had "between fifteen and twenty-five links on the Order Page, and various text is displayed in at least four font sizes and six colors (blue, yellow, green, red, orange, and black), alongside multiple buttons and promotional advertisements."

Furthermore, the actual text of the notice could not be clearer. There is nothing confusing or ambiguous about the simple and direct wording: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." The only possible buttons to click on the page had the text "Continue" or "Continue with [service provider]," such that there could be no confusion that pressing any of these buttons was an affirmative act of "continuing" and thereby agreeing to the terms.

### b. Temu's Terms of Use hyperlink was reasonably sized, bolded, and easily visible.

Temu's Terms of Use notice text is in a size slightly smaller than most of the other text on the page. However, it is not significantly smaller, nor so small as to be unreadable.[3] Using slightly smaller sized text does not render the text inconspicuous. *See Meyer v. Uber Techs.*, 868 F.3d 66, 78 (2d Cir. 2017) (even if font is small, the print contrasts with the white background); *Lee v. Ticketmaster, L.L.C.*, 817 F.App'x 393, 394-95 (9th Cir. 2020) (enforcing arbitration agreements where the text notices were smaller than surrounding text); *Fagerstrom v. Amazon.com, Inc.*, 141 F.Supp.3d 1051, 1069 (S.D. Cal. 2015), *aff'd sub nom.*, *Wiseley v. Amazon.com, Inc.*, 709 F.App'x 862 (9th Cir. 2017) (enforcing arbitration agreement where the text was "somewhat smaller" but the hyperlink was easily seen).

Moreover, the **Terms of Use** hyperlink is bolded and so stands out clearly from the white background. The background color for the notice text is white, just like the background for the entire page, including the fillable boxes and clickable buttons (except for the orange "Continue" button). Thus, again, users can easily read the text and it is

---

[3] The difference in font size is approximately the same difference as that between a 14-point font (i.e., that used for this brief) and a 12-point font (i.e., the size allowed by many district courts in this Circuit, e.g., D.Colo.LCivR 10.1(d), D.UtahCivR 10-1(a)(3), D.Kan. Rule 5.1(a), D.Wyo.R. 10.1(a), E.D.Okla. LCvR 5.2(a), N.D.Okla LGnR2-4(a), D.N.M. individual judge's rules).

not being hidden or camouflaged against a background color making it difficult to read.

The notice text is in a gray color, as is other text on the screen. For instance, the "Email or phone number" text is also in gray. This shading does not interfere with the legibility of the text, and the use of gray for the notice text makes the bolded hyperlinks stand out even more.

The use of a gray color in combination with smaller sized text is very common in online screens. These design choices do not per se indicate that the notice is not reasonably conspicuous. Although older or more traditional webpages often put hyperlinked terms in blue and underlined text, that convention is not required for a screen to pass muster. *E.g.*, *Patrick*, 93 F.4th at 477 ("That the links are not blue, underlined, or capitalized does not undercut" the conclusion that the screen provided reasonably conspicuous notice.).

The font typeface and style for the notice text and **Terms of Use** appear in the same sans-serif style used for all text on the page, and are not modified in any way to distract from reading it. The key phrase "**Terms of Use**" capitalizes "Terms" and "Use," and is bolder and darker than the notice text for emphasis.

The Ninth Circuit has reasoned that "to be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th

849, 856 (9th Cir. 2022). In *Berman*, the text was in a "tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed a font so small that it is barely legible to the naked eye." *Id.* at 856-57. Here, it cannot be said that the notice text on Temu's screen is "barely legible to the naked eye." To the contrary, Temu's notice is in a very readable size.

### c.     Temu's Terms of Use hyperlink was sufficiently adjacent to the relevant "Continue" buttons.

The placement of Temu's notice text and hyperlinked Terms of Use was also user-friendly and readily visible. The notice text is immediately below the last "Continue" button in the column of five similar buttons, one of which must be pressed to continue. Any reasonable online consumer would expect terms of use to appear somewhere on the page, typically on the bottom. And any reasonable online consumer would understand the notice text to apply to any of the "Continue" buttons—i.e., there is no logical basis for thinking that the phrase "By continuing" would *not* refer to clicking any of the "Continue" buttons. Notably, there is no intervening text (or even space) between the notice text and the last "Continue" button in the column. (App-114.)

In short, the reasonable consumer, wishing to create an account or log in, would view the column of buttons and recognize that there were multiple options to continue (e.g., entering an email or phone number, or clicking to continue via existing Google, Facebook, Apple, or Twitter

accounts). Having looked at each of these options, the reasonable user would also see the notice text immediately below the "Continue" buttons. In short, the user's line of sight would naturally run down the column of possible buttons and then to the notice text.

### d. Temu's repetition of the notices across multiple screens made the notices more conspicuous.

Repetition of notices on multiple webpages also makes notices more conspicuous. *See Oberstein*, 60 F.4th at 518 ("repetition of the notices" is a feature enhancing constructive notice); *Selden v. Airbnb, Inc.*, 2016 WL 6476934, *5 (D.D.C. Nov. 1, 2016) (noting that "sign-in-wrap agreements are usually upheld if notice of the hyperlinked terms and conditions is present on multiple successive webpages of the site" [citation omitted]); *Berkson v. Gogo LLC*, 97 F.Supp.3d 359, 401 (E.D.N.Y. 2015) (same); *Feld v. Postmates, Inc.*, 442 F.Supp.3d 825, 829 (S.D.N.Y. 2020) (same); *Melo v. Zumper, Inc.*, 439 F.Supp.3d 683, 698 (E.D. Va. 2020) (same). Here, Temu repeats its "By continuing …" notice language both on the initial screen (App-114) and the follow-up screen (App-115).

\* \* \*

In sum, the overall design of Temu's screen—proximate placement, obvious hyperlinks, text color, typeface, style, and size, against a clear visible background, lack of clutter, and repetition and other design factors—provided reasonably conspicuous notice.

## 2. Precedent from many courts supports the conclusion that Temu's screen provided reasonably conspicuous notice.

Numerous courts around the country have held that screens with the same or very similar designs to that used by Temu provide reasonably conspicuous notice to the typical online user, and thus have routinely enforced arbitration provisions like Temu's here.

For example, the screen in *Walker v. Neutron Holdings, Inc.*, 2020 WL 703268, *3 (W.D. Tex. Feb. 11, 2020) resembles Temu's, in that the notice text is in smaller, grey text, and a single-sentence notice text with Terms of Service (which is bolded, but not in blue or underlined), is below two different sign-in methods with multiple buttons separated by "or":



Similarly, the screen in *Meyer v. Uber Technologies*, 868 F.3d at 81 has the notice text at the bottom of the screen in smaller gray text (with Terms of Service in blue), and is below multiple sign-in options separated by "or" (*see also Feld v. Postmates, Inc.*, 442 F.Supp.3d 825, 827 (S.D.N.Y. 2020) (same screenshot at 1:19-cv-03899, Dkt. 23-5)):



The same sort of multiple sign-in methods and "or" separator appears in *Selden v. Airbnb, Inc.*, 2016 WL 6476934, *5 (D.D.C. Nov. 1, 2016), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021), which also uses small gray text and non-underlined Terms of Service (in red):



These same design elements (multiple-method sign-in boxes, "or" separator, small notice text at bottom, non-underlined Terms of Service) also appear in *Rainey v. A Place for Rover, Inc.*, 2022 WL 16942849, *1 (C.D. Cal. July 18, 2022) (screenshot at No. 2:22-cv-00403-RGK-E, Dkt. 20-1):



And again in *Moyer v. Chegg, Inc.*, 2023 WL 4771181, *1 (N.D. Cal. July 25, 2023):



*See also Plazza v. Airbnb, Inc.*,
289 F.Supp.3d 537, 544 (S.D.N.Y.
2018) (screenshot at 16-CV-1085,
Dkt. 21-3; "or" separator); *Melo*,
439 F.Supp.3d at 689 (screenshot
at No. 3:19-cv-00621, Dkt. 12-1,
with "or" separator, gray notice
text, non-underlined "Terms and
Conditions" hyperlink); *and see
Peter v. DoorDash, Inc.*, 445
F.Supp.3d 580, 582 (N.D. Cal.
2020) (screenshot at 19-cv-06098,
Dkt. 17-1):



Some screens—similar to Temu's—even use an orange "sign in" button, followed by alternative sign-in methods, all above small notice text with non-underlined terms of use hyperlinks, e.g., *Moyer*, 2023 WL 4771181, *1 (N.D. Cal. July 25, 2023) ("or" separator; orange button, non-underlined "Terms of Use"); *HomeAdvisor, Inc. v. Waddell*, 2020 WL 2988565 (Tex. App. June 4, 2020) (large orange button on uncluttered page); *Gennaro v. Avvo, Inc.*, 2019 WL 13488559, *4 (S.D. Cal. May 6, 2019) (screenshot at 18-cv-2213, Dkt. 27-3):



All of these similar screens should suffice to show that Temu's screen adequately provides the requisite notice. But there is more: One court has even examined the same Temu screen and found that its "full-screen user interface design with the 'Continue' button just above the bolded hyperlink to the Terms of Use is conspicuous enough to put a reasonably prudent person on inquiry notice." *Fontanez*, at App-103.

Temu acknowledges that another court examining Temu's screen reached a conclusion contrary to *Fontanez*. In *Johnson*, the court objected to various design features, i.e., that the hyperlink was not "prominent or particularly remarkable," was located "at the bottom of the page," and used "a very light grey font against a white background, devoid of underlined text or any conspicuous visual cues." *Johnson*, App-179. The *Johnson* court cited cases where the "light grey color render[ed text] practically unreadable" and where "terms and conditions were buried at the bottom of the page," and concluded that Temu's notice was similarly "tucked away at the bottom of the page in barely visible font." *Id.* The *Johnson* court "respectfully disagree[d]" with *Fontanez*. *Id.* at n.8. Temu respectfully disagrees with *Johnson*. This Court, engaging in *de novo* review, can look at Temu's screen (App-114 and page 11 above) and see for itself that—contrary to *Johnson*—Temu's notice text is not "camouflaged," is not "practically unreadable," is not "buried," and is not "barely visible."

### 3. The district court focused too narrowly on specific design elements, underestimated the reasonable user, and did not consider the webpage as a whole.

The district court's analysis of Temu's screen is out of step with the bulk of precedent and with the realities of online commerce and standard webpage design.

The district court focused on certain design elements that it believed made Temu's notice text and Terms of Use inconspicuous. In particular, the court objected to the use of a "relatively small font" located "at the bottom of the screen," that was "spatially decoupled from the attention-grabbing orange 'Continue' button." (App-200.) These points fail to appreciate what ordinary internet webpages look like.

Calling the orange "Continue" button on Temu's screen "attention-grabbing" seems anachronistic in comparison to pages with vivid graphics appearing on webpages that nonetheless adequately provide notice, like those in *Keebaugh* (screenshots at 22-55982, Dkt. 10):




If these battling dragons are not "attention-grabbing" distractions, then it seems hard to say that an oblong orange button is.

Moreover, the use of notice text in a smaller font on the bottom of a screen is more the norm than anything else, as seen in the numerous examples cited above. *See also Route App, Inc. v. Heuberger*, 2022 WL 2316377 (D. Utah 2022) (although text was small, it sufficiently contrasted with the white background; although the terms of service

hyperlink was not adjacent to the 'continue' button it was in "close enough proximity" and was visible on the same screen).

The district court was particularly concerned with the placement of the notice text, hypothesizing that it could be "unclear whether the terms of use agreement even pertains to the creation of an account using email or phone number." (App-200.) In other words, the court appears to view the "or" separator (between inputting an "Email or phone number" or clicking "Continue with Google," etc.) as disconnecting the notice text from the email/phone number option. This is an unfair stretch. Under that analysis, the notice text would have to be repeated under every one of the Continue buttons, or at least repeated twice on the same page. That would make for a cluttered design. On *de novo* review, this Court should find that any reasonable user of the webpage would realize that clicking *any* of the Continue buttons would be agreement to the Terms of Use.

The court also states that Temu's screen's "most glaring" "failure" is not adequately distinguishing the Terms of Use hyperlink "from its surrounding text," citing *Berman*. (App-200.) This criticism is far off base. Consider the screens in *Berman*, 30 F.4th at 857, Appendices A & B:




*Berman* is the classic example of hiding a Terms of Use hyperlink in sea of "surrounding text."

In contrast, Temu's webpage has no distracting or surrounding text at all. *See also Edmundson v. Klarna, Inc.*, 85 F.4th 695, 704 (2d Cir. 2023) (screen provides reasonably conspicuous notice when terms are on an uncluttered page, near the operative button, and the user

need not scroll beyond what is immediately visible to find the terms). Temu's notice text and Terms of Use hyperlink stand alone on the page in plain sight, centered at the bottom, where a user's line of sight would naturally go to view all the various sign-in options.

The district court also criticizes Temu's use of "grey font against a white backdrop." (App-200.) But the use of grey colored text is not unusual (especially when appearing on an all-white background), and the selection of that color or shading does not necessarily mean that the text is not reasonably conspicuous. The court continues by pointing out that "the traditional hallmarks of hyperlinked text" are absent, e.g., blue text, underlined text, and/or all caps text. (App-200-01.) The court thus concludes that Temu's "failure to adequately distinguish the hyperlinked text, coupled with its obscure placement" dooms the terms as not reasonably conspicuous. (App-201.) Temu disagrees and has already cited ample precedent to support its position.

To be sufficiently conspicuous, hyperlinks need not necessarily be in any particular color. What matters is whether the reasonable user can see them. Here, Temu's use of bolded grey text on a white background on a screen without any distractions should suffice—just as it has in many other cases.

Nor is the location of the notice text "obscure"—it is directly beneath the various "Continue" buttons. The idea that the text should be construed as a matter of proximity and design to apply only to the

single button immediately above it ("Continue with Twitter") makes no sense. No reasonable user would interpret the screen that way, nor would any reasonable user want the screen to have the same notice text immediately below every button. Furthermore, there is no recourse to the argument that the notice text would only apply to the "Continue" buttons connected to existing internet accounts (e.g., Twitter, Apple, Facebook, and Google). No reasonable user would interpret the screen to mean that "continuing" via such an account would constitute agreeing to the Terms of Use, but "continuing" via inputting an email address or phone number would *not*. Reasonable users understand that creating an online account (especially with a company selling goods over the internet) comes with terms of use.

## CONCLUSION

This Court should reverse the district court's denial of arbitration and order Eakins to arbitrate her claims.

## ORAL ARGUMENT REQUEST

Oral argument is necessary because this appeal raises significant questions of first impression in this Circuit.

July 8, 2024        Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

By: *s/Benjamin G. Shatz*
     *Attorney for Appellant*
     Whaleco Inc. d/b/a Temu

# 10th Circuit Rule 28.2 ATTACHMENT
## ORDER ON APPEAL

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

VALERIE EAKINS, individually and on behalf )
of all others similarly situated, )
                                )
         Plaintiff, )
                                )
v.                              )      Case No. CIV-23-560-J
                                )
WHALECO INC. d/b/a TEMU, )
                                )
         Defendant. )

**ORDER**

Before the Court is Defendant's Motion to Compel Arbitration [Doc. No. 33], wherein it moves to compel arbitration and dismiss or, alternatively, stay this action pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.* Defendant's brief in support was filed separately (Def.'s Br.) [Doc. No. 33-1]. Plaintiff responded (Pl.'s Resp.) [Doc. No. 39], and Defendant replied [Doc. No. 40].[1] Upon review of the parties' submissions, Defendant's motion to compel arbitration is denied.

**I.**    **Background**

Plaintiff initiated this proposed class action under Oklahoma's recently enacted Telephone Solicitation Act (OTSA), Okla. Stat. tit. 15, § 775C.1 *et seq.*[2] She claims Defendant violated the OTSA by sending automated text messages to her cellular phone without prior express consent.

Defendant runs an online marketplace where consumers can purchase a variety of products. To participate in this marketplace, one must first create an account through Defendant's

---

[1] All page citations refer to the Court's CM/ECF pagination.

[2] The OTSA prohibits telephonic sales calls, including text messages, to wireless phones if such calls involve an automated system for the selection or dialing of telephone numbers without the prior express consent of the receiving party. *See* Okla. Stat. tit. 15, §§ 775C.2–775C.4.

**194**

smartphone application (App) or website. In doing so, a user is presented with the following screen[3]:



As shown, a user can create an account (1) by entering their email or phone number and pressing a bright orange "Continue" button, or (2) by pressing one of the other four white buttons. At the bottom of the screen, beneath the "Continue with Twitter" button, is a statement in light grey font that reads: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." The "**Terms of Use**" text is hyperlinked and, if pressed, leads to a separate document containing a mandatory arbitration provision.

On January 19, 2023, Plaintiff downloaded Defendant's App and created an account by entering her phone number. Pointing to Plaintiff's conduct and apparent agreement to

---

[3] The screenshot included herein was provided by both parties.

2

Defendant's terms, including arbitration, Defendant now moves to compel arbitration. Plaintiff, in response, argues that no arbitration agreement exists given the inconspicuous placement of the terms of use agreement.

## II.   FAA Framework

The FAA creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The FAA provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "establishes a liberal federal policy favoring arbitration agreements," *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (internal quotation marks omitted), and "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed," *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).

Yet, despite this liberal policy favoring arbitration, "the FAA was not enacted to force parties to arbitrate in the absence of an agreement." *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1286 (10th Cir. 1997). "The existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Id.* at 1287. This initial determination requires the application of "ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). If a valid arbitration agreement exists, a court must then determine whether the dispute falls within the scope of that agreement. *Cavlovic v. J.C. Penney Corp.*, 884 F.3d 1051, 1057 (10th Cir. 2018).

III.     Analysis

A.     Choice of Law

At the outset, the parties disagree as to which state's law applies in determining whether an arbitration agreement exists. Defendant argues that New York law controls and points to a choice-of-law provision in its terms of use. Def.'s Br. at 16. Plaintiff counters that applying the choice-of-law provision to resolve the issue of contract formation would presume the applicability of a provision before its adoption by the parties has been established; she maintains that Oklahoma law controls. Pl.'s Resp. at 10.

But the parties' disagreement is largely irrelevant. In both states, parties must manifest their mutual assent to the essential terms of an agreement. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288–89 (2d Cir. 2019) (applying New York law); *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1256 (10th Cir. 2012) (applying Oklahoma law). "The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act," but "[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." Restatement (Second) of Contracts § 19 (1981). "The making of contracts over the internet 'has not fundamentally changed the[se] principles of contract.'" *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 366 (E.D.N.Y. 2009) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004)). Courts widely recognize that "[u]nless the website operator can show that a consumer has actual knowledge of the [online] agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her

4

assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)

(applying New York and California law); *see also Hancock*, 701 F.3d at 1256 (applying Oklahoma

law); *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 882 (N.D. Ill. 2020) (applying

Illinois law); *Gaudreau v. My Pillow, Inc.*, No. 6:21-cv-1899-CEM-DAB, 2022 WL 3098950, at

*4 (M.D. Fla. July 1, 2022) (applying Florida law).

There is nothing to suggest that Plaintiff had actual notice of Defendant's terms of use.

The Court must determine then whether Plaintiff received reasonably conspicuous notice that she

was agreeing to Defendant's terms when creating her account.

**B.     Online Agreements**

Broadly speaking, there are two types of online agreements: "clickwraps" and

"browsewraps."  These agreements have been described as follows:

> [O]ne way in which we have previously distinguished web-based contracts is the
> manner in which the user manifests assent—namely, "clickwrap" (or "click-
> through") agreements, which require users to click an "I agree" box after being
> presented with a list of terms and conditions of use, or "browsewrap" agreements,
> which generally post terms and conditions on a website via a hyperlink at the
> bottom of the screen.  Courts routinely uphold clickwrap agreements for the
> principal reason that the user has affirmatively assented to the terms of agreement
> by clicking "I agree."  Browsewrap agreements, on the other hand, do not require
> the user to expressly assent.  Because no affirmative action is required by the
> website user to agree to the terms of a contract other than his or her use of the
> website, the determination of the validity of the browsewrap contract depends on
> whether the user has actual or constructive knowledge of a website's terms and
> conditions.

*Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (internal footnotes, citations, and

quotation marks omitted); *see also Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir.

2023) (describing clickwrap and browsewrap agreements similarly); *Hancock*, 701 F.3d at 1255

(describing clickwrap agreements similarly).

But there are countless ways to design a website or smartphone application, and "not all interfaces fit neatly into the clickwrap or browsewrap categories." *Meyer*, 868 F.3d at 75. Such is the case here, where Defendant's App notifies the user of its terms of use and, instead of providing an "I agree" box to check, advises the user that she is agreeing to the terms of use when creating an account. Similar agreements have been referred to as "sign-in-wraps,"[4] *see, e.g.*, *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 399 (E.D.N.Y. 2015) ("A questionable form of internet contracting has been used in recent years—sign-in-wraps. These internet consumer contracts do not require the user to click on a box showing acceptance of the 'terms of use' in order to continue. Rather, the website is designed so that a user is notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-in or login process."), though categorization is not dispositive, *see Meyer*, 868 F.3d at 76.

In the context of online agreements, courts engage in fact-intensive inquiries of "the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put her on inquiry notice of such terms." *Starke*, 913 F.3d at 289; *see also Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 WL 2316377, at *3 (D. Utah June 28, 2022) ("To determine whether sign-in-wrap and browsewrap agreements are enforceable, courts engage in fact-intensive inquiries of the layout and language of a website or application."). Such a focus is consistent with the parties' submissions—though they disagree on whether Defendant's App provided reasonably conspicuous notice.

---

[4] Defendant characterizes its online agreement as a clickwrap, likely because clickwrap agreements "are increasingly common and have routinely been upheld." *Hancock*, 701 F.3d at 1256 (internal quotation marks omitted). But Defendant's App did not require Plaintiff to check a separate box indicating her assent to Defendant's terms. Indeed, she could create an account without ever viewing Defendant's terms. The Court finds the agreement here is best characterized as a sign-in-wrap.

C.      **Defendant's App**

The Court turns its attention to Defendant's App.  In doing so, it concludes that the App failed to provide reasonably conspicuous notice that Plaintiff was agreeing to Defendant's terms of use when creating her account.

For starters, the terms of use agreement appears in relatively small font at the bottom of the screen—spatially decoupled from the attention-grabbing orange "Continue" button that users click to create their account.  *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) (recognizing courts' refusal to enforce online agreements "[w]here the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it"); *Starke*, 913 F.3d at 294 (rejecting enforcement of arbitration agreement where the "Terms & Conditions" hyperlink was "spatially decoupled" from the portion of the website "actually requiring [plaintiff's] attention"); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466–67 (S.D.N.Y. 2017) (rejecting enforcement of arbitration agreement where the "'I agree to Lyft's Terms of Service' [was] in the smallest font on the screen, dwarfed by the jumbo-sized pink 'Next' bar at the bottom of the screen and the bold header 'Add Phone Number' at the top").  While other, closer buttons are available, the orange button—in both placement and coloring—is set apart.  One could argue it is initially unclear whether the terms of use agreement even pertains to the creation of an account using email or phone number.

Most glaring, however, is the App's failure to distinguish the "Terms of Use" hyperlink from its surrounding text.  *See Berman*, 30 F.4th at 857 ("[W]hile it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent.").  The notice here appears in grey font against a white backdrop, and while "Terms of Use" is a darker shade of grey, the contrast is neither remarkable nor presents with the traditional hallmarks

7

200

of hyperlinked text.  *See id.* ("A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently set apart from the surrounding text. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage." (internal citation and quotation marks omitted)); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63 (1st Cir. 2018) ("While not all hyperlinks need to have the same characteristics, they are commonly blue and underlined." (internal quotation marks omitted)).  Courts have generally "required more than mere coloring to indicate the existence of a hyperlink to a contract." *Applebaum*, 263 F. Supp. 3d at 467 (citing *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016) ("Where the terms are not displayed but must be brought up by using a hyperlink, courts . . . have looked for a clear prompt directing the user to read them.")).  The App's failure to adequately distinguish the hyperlinked text, coupled with its obscure placement of the terms of use agreement, fails the conspicuous test.

Defendant's reliance on *Fontanez v. Whaleco, Inc.*, No. 53-2023CA-000374 (Fla. Cir. Ct. Aug. 29, 2023), *see* (*Fontanez* Order) [Doc. No. 33-2],[5] does not alter the Court's conclusion.  The *Fontanez* court examined the very online platform at issue here and concluded that its terms of use agreement was "conspicuous enough to put a reasonably prudent person on inquiry notice." *Id.* at 6.  However, the plaintiff in *Fontanez* created her account with the "Continue with Apple" button "directly above" the terms of use agreement. *Id.* at 5.  Moreover, and more importantly, she had already filed "eleven class action lawsuits," and the "reasonable inference [was] that . . . [she]

_____

[5] It appears that this case is not available on Westlaw of LexisNexis.

should have been aware that online retailers have 'Terms of Use' or 'Terms and Conditions' agreements." *Id.* at 3.

*Fontanez*'s persuasive is further tempered by *Johnson v. Whaleco, Inc.*, No. 5:23-cv-403-GAP-PRL, U.S. Dist. LEXIS 184104 (M.D. Fla. Oct. 13, 2023) (not available on Westlaw), which recently examined Defendant's online platform and concluded that its terms of use agreement was not conspicuously disclosed.  The *Johnson* court reasoned, as this Court does here, that "the hyperlink to the Terms is not prominent or particularly remarkable at the bottom of the page where it is featured." *Id.* at *7 (brackets and internal quotation marks omitted).  Even more "damning" was the platform's "use of a very light grey font against a white background, devoid of underlined text or any conspicuous visual cues." *Id.* at *7–8.

Neither is the Court convinced that Plaintiff's subsequent use of the App—where she "was presented with a screen identical to the one she would have seen when she initially registered her account through the App back in January," Def.'s Br. at 13—weighs in favor of arbitration.  If Defendant's notice was inconspicuous when Plaintiff created her account, the Court is unsure how such notice, if unaltered, became any clearer over time.

In sum, the Court concludes that the parties did not enter into a valid arbitration agreement.  The Court need not address whether Plaintiff's claims fall within the scope of any arbitration agreement.

**IV.**     <u>**Conclusion**</u>

For the reasons set forth herein, Defendant's Motion to Compel Arbitration [Doc. No. 33] is DENIED.

IT IS SO ORDERED this 5th day of March, 2024.

9

**202**

64

BERNARD M. JONES
UNITED STATES DISTRICT JUDGE

**203**

**Certificate of Compliance**
**for Briefs with Type-Volume Limit**

1.    This **Appellant's Opening Brief** complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(g) and the word limit of Rule 28(e)(2) because, excluding the parts of the document exempted by Rule 32(f), this document contains **8,675** words.

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using the **Microsoft Word** (version Microsoft for Microsoft Word 365 MSO) word processing program in **14-point Century Schoolbook**.

Date: July 8, 2024          *s/Benjamin G. Shatz*
                                         Benjamin G. Shatz
                                         MANATT, PHELPS & PHILLIPS, LLP
                                         2049 Century Park East, Suite 1700
                                         Los Angeles, CA 90067

                                         *Attorney for Appellant*
                                         Whaleco Inc. d/b/a Temu